DECISION
Plaintiff seeks an income tax exemption on her 2006 state income tax return for the value of the health care benefits her employer provides to her male live-in domestic partner (i.e., significant other). Defendant denied the exemption as contrary to its administrative rule. The matter is before the court on cross-motions for summary judgment. Plaintiff appeared on her own behalf. Defendant was represented by Nancy Grigorieff, a CPA employed by the Department of Revenue.
 I. STATEMENT OF FACTS
The parties agree to the following facts. Plaintiff filed a 2006 Oregon income tax return on April 18, 2007, with a filing status of "single," and claiming one exemption for herself and no exemptions for dependents. The return included a $5,313 subtraction for "domestic partner benefits." The $5,313 subtraction relates to the imputed value of health insurance benefits provided by Plaintiff's employer for "domestic partner benefits." The $5,313 imputed value of those health insurance benefits was included in Plaintiff's federal adjusted gross income for 2006. *Page 2 
Plaintiff's "domestic partner" who qualified for the above health insurance benefits during 2006 is of the opposite sex. During 2006, Plaintiff was not legally married to the individual who qualified for the domestic partner benefits.
The exemption is claimed on the return by subtracting the "income." Defendant disallowed the $5,313 subtraction, which increased Plaintiff's net tax by $477, because there is no provision in Oregon law (applicable to tax year 2006) for an exclusion from Oregon taxable income for the imputed value of health insurance benefits provided to opposite sex "domestic partners." Oregon Administrative Rule (OAR) 150-316.007-(B)[1] provides an exclusion from Oregon taxable income for the imputed value of health insurance benefits provided to same-sex domestic partners.
 II. ISSUE
Does Defendant's rule, which exempts from state income tax the imputed value of health insurance benefits provided by an employer to an employee's same-sex domestic partner, but not the imputed value of such benefits provided by an employer to an employee's opposite-sex domestic partner, violate Oregon's privileges and immunities clause?
 III. ANALYSIS
A. Introduction and Overview
OAR 150-316.007-(B) allows for an exemption from state income tax for the imputed value of health insurance benefits provided by employers to an employee's same-sex domestic partner. Defendant promulgated the rule following the Court of Appeal's decision in Tanner v. OHSU,157 Or App 502, 971 P2d 435 (1998), rev den, 329 Or 527, 994 P2d 129 (1999) (Tanner), and an Oregon Attorney General Opinion (No. 8268) issued in 1999 interpreting the *Page 3 Tanner decision. Plaintiff in the present case asserts that her rights under the privileges and immunities clause of the Oregon Constitution are being violated because the court, and the rule, go too far in limiting the benefit to only same-sex domestic partners.
The rule provides in relevant part as follows:
 "(1) The imputed value of health insurance benefits provided by an employer to an employee's domestic partner shall be exempt from state income tax.
 "(2) As used in this rule, `domestic partner' means a person in a relationship with an employee, each of whom
 "(a) Is under no legal disability to marry the other person, but for the fact that each is of the same sex;
 "(b) Desires a relationship of marriage under Oregon law and would enter into marriage with the other person, and only with the other person, if Oregon law permitted it[.]"
OAR 150-316.007-(B) (emphasis added).[2]
OAR 150-316.007-(B) was promulgated by the Department of Revenue (the department), through its authority to make rules and regulations under ORS 305.100, [3] in order to meet the constitutional requirements set forth by the Court of Appeals in its decision in Tanner. Tanner held that Oregon Health Sciences University's (OHSU) "denial of [health] insurance benefits to the unmarried domestic partners of its homosexual employees violated Article I, section 20, of the Oregon Constitution."[4] *Page 4 Id. at 525. After the Tanner decision was issued, the state, when acting as a public employer, must provide the same health insurance coverage to same-sex couples that it provides to married couples. See id. (affirming the trial court's order inTanner v. OHSU, WL 585547 (Or Cir 1996), enjoining OHSU from denying health insurance coverage to domestic partners of homosexual employees when such benefits are afforded to the spouses of heterosexual employees).
Because Oregon allowed a state income tax exemption for the value of health insurance coverage that employers provide for their employees' spouses, but did not allow a similar exemption for unmarried same-sex domestic partners, OAR 150-316.007-(B) became necessary, followingTanner, for the state to avoid violation of Article I, section 20, of the Oregon Constitution.
In promulgating OAR 150-316.007-(B), the department closely followed the definition of "domestic partner" set forth in the trial court's order. Of particular relevance, the administrative rule retained the order's requirement that domestic partners be of the same sex and desiring marriage if Oregon law permitted them to be married.Compare Tanner v. OHSU, WL 585547 at *4 (Or Cir 1996) (defining domestic partners as couples that, in part, "would be married to each other if the law permitted them to marry in Oregon" and who are "each homosexual"), with OAR 150-316.007-(B) (defining domestic partners as couples that "desire a relationship of marriage under Oregon law and would enter into marriage with the other person * * * if Oregon law permitted it" and who are "each of the same sex."). *Page 5 
B. The Tanner Framework for Article I Section 20, Analysis
The Court of Appeals used a three-part analytical framework to reach the conclusion that OHSU's denial of health insurance benefits to unmarried domestic partners of its homosexual employees violated Article I, section 20, of the Oregon Constitution. Tanner, 157 Or App at 523-25. OHSU's actions were found to violate section 20 because: (1) the plaintiffs were members of a "true" class that is disparately treated; (2) the plaintiffs were members of a "suspect" class that was disparately treated; and (3) the disparate treatment was not "justified by genuine differences between the class and those to whom the privileges are made available." See Tanner, 157 Or App at 523-24.
1. Is the plaintiff a member of a "true" class that is disparatelytreated?
The first part of the Tanner analysis asks if the plaintiff is a member of a "true class" that is disparately treated. Id. at 520. Article I, section 20, forbids "inequality of privileges or immunities not available `upon the same terms,' first, to any citizen, and second, to any class of citizens. State v. Clark, 291 Or 231, 237, 630 P2d 810
(1981) (emphasis added). As explained by the court in Clark, the clause "may be invoked by an individual who demands equality of treatment with other individuals as well as by one who demands equal privileges or immunities for a class to which he or she belongs." Id. at 237. The present case deals with the latter, Plaintiff arguing that she is part of a class — people of the opposite sex who live together but choose not to marry — to whom the benefits of the Department's rule are denied. (Ptf's Br at 2.)
The Tanner court noted that "the term `class' takes on special meaning" in Article I, section 20, case law; "only laws that disparately treat a `true class' may violate that section of the *Page 6 
constitution." Tanner, 157 Or App at 520 (citing State ex rel.Huddleston v. Sawyer, 324 Or 597, 610, 932 P2d 1145, cert den,118 S Ct 557 (1997)).
A "true class" is one having identities apart from the challenged law or government action and that is clearly defined in terms of adhominem, personal and social characteristics, or societal status.Tanner, 157 Or App at 520-21. The court listed, as examples of true classes, "gender, ethnic background, legitimacy, past or present residency, and military service." Id. at 521 (citing Clark,291 Or at 240). On the other hand, a class created solely by statute or government action at issue is not a true class. Id. In Tanner, the court found that there was "no question but that plaintiffs are members of a true class," the class being unmarried homosexual couples, because that class is "clearly defined in terms of ad hominem, personal and social characteristics," and because the class is not one created by a statute or challenged government action. Id. at 523.
Besides being members of a true class, same-sex domestic partners of OHSU employees were also treated disparately, the court found, when they were denied health benefits that were available to opposite-sex spouses of OHSU employees, because they were members of a class "to which certain privileges and immunities [were] not made available."Id. at 524.
2. If the plaintiff is a member of a true class, is the classification"suspect?"
Having decided that the plaintiffs were members of a true class, the court turned to the question of whether they were members of a "suspect class." Id. at 523-24. The court first noted that, although early cases looked for "immutable" characteristics in "defining a suspect class under Article 1, section 20, subsequent cases make clear that immutability — in the sense of inability to alter or change — is not necessary." Id. at 522. Rather, more recent cases have made clear that a class is "suspect" if it is based on characteristics that are "historically regarded as defining distinct, *Page 7 
socially recognized groups that have been the subject of adverse social or political stereotyping or prejudice." Id. at 523. Thus, noted the court, in addition to gender and race, alienage and religious affiliation have been found to be "impermissible criteria" for classification (i.e., suspect), even though either "may be changed almost at will." Id. at 522-23.
The Tanner court held that same-sex domestic partners are members of a suspect class despite the lack of immutability, because sexual orientation is widely regarded as defining a distinct, socially recognized group of citizens, and homosexuals "have been and continue to be the subject of adverse social and political stereotyping and prejudice." Id. at 524.
3. If the plaintiff is a member of a suspect class, is the disparatetreatment between the class and those to whom the privileges are madeavailable justified?
Because the plaintiffs were members of a suspect class,Tanner applied a "more demanding level of scrutiny" for the third step of the analysis, and asked whether the disparate treatment was justified by "genuine differences between the class and those to whom the privileges and immunities are made available." Id. at 521, 524. The court held that the disparate treatment received by domestic partners of homosexual OHSU employees cannot be justified by their homosexuality.Id. at 524. No justification had been suggested by the parties and the court could not envision any. Id.
In applying the third part of the analytical framework, the court "draws a distinction between `suspect' classes and other true classes."Id. at 521. "Suspect classes" are subject to a "more demanding level of scrutiny." Id. On the other hand, questions involving true classes that are not "suspect" only require the use of a less demanding "rational basis" test in order to *Page 8 
complete the third part of the inquiry. Cox v. State of Oregon,191 Or App 1, 4, 80 P3d 514 (2003).[5]
C. Tanner Holding Does Not Extend to Opposite-sex, Unmarried DomesticPartners
Article I, section 20 does not require the extension of the state income tax exemption for the value of health insurance benefits that employers provide to employees' opposite-sex domestic partners. Applying the Tanner analytical framework to opposite-sex, unmarried domestic partners leads to such a conclusion because the class, although a true class that is disparately treated, is not one that is suspect, and the disparate treatment bears a rational relationship to a legitimate state interest.
1. Are opposite-sex, unmarried domestic partners members of a trueclass that is disparately treated?
Opposite-sex, unmarried domestic partners are members of a true class because, similar to same-sex domestic partners, they (1) are not defined by any statute or practice that is the subject of plaintiffs' challenge, and (2) belong to a class that is clearly defined in terms of adhominem, personal and social characteristics. Tanner, 157 Or App at 523. That is, opposite-sex, unmarried domestic partners are not defined by OAR 150-316.007-(B) and can be identified by their shared personal characteristics. Furthermore, the class is disparately treated because members of the class are unable to obtain the tax exemption that same-sex domestic partners are allowed under OAR 150-316.007-(B).
2. If opposite-sex, unmarried domestic partners are members of a trueclass, is the classification suspect?
Although opposite-sex, unmarried domestic partners are members of a true class, the classification is not suspect because "distinctions between married and unmarried people have not *Page 9 
yet been recognized as suspect." McGinley and McGinley, 172 Or App 717,730, 19 P3d 954 (2001) (McGinley). The Tanner court held that same-sex domestic partners are members of a suspect class because the classification was "based on characteristics historically regarded as defining distinct, socially recognized groups that have been the subject of adverse social or political stereotyping or prejudice."Tanner, 157 Or App at 523.
Although it may be argued that opposite-sex, unmarried domestic partners are part of a distinct, socially recognized group, it is not apparent that they have been the subject of the kind of adverse social or political prejudice faced by same-sex domestic partners and members of other suspect classes. Opposite-sex, unmarried domestic partners have been subject to some discrimination, [6] but the social and political attitude toward the class has generally been nondiscriminatory, as the traditional family unit has undergone significant changes in the last half-century, and cohabitation without marriage has, for better or worse, become quite common. See Doherty and Wizner, 210 Or App 315, 328,150 P3d 456 (2006) (noting that the traditional family unit has undergone significant changes since the 1960s as the marriage rate has declined and cohabitation rates have significantly increased). Suspect classes have been "routinely targeted for adverse treatment over the years in our society." McGinley, 172 Or App at 726 (emphasis added). There is no evidence that opposite-sex, unmarried domestic partners have been the target of the routine adverse treatment that characterizes members of suspect classes. And, Plaintiff has alleged no such treatment. Accordingly, the court concludes opposite-sex, unmarried domestic partners are not members of a suspect class. *Page 10 
3. Is the disparate treatment of opposite-sex, unmarried domesticpartners justified on a "rational basis" examination?
Opposite-sex, unmarried domestic partners are members of a non-suspect true class and "[d]isparate treatment of such classes may be justified on a `rational basis' examination." Tanner, 157 Or App at 523; see alsoGall I v. Dept. of Rev., 19 OTR 188, 194, WL 3487425 (Nov 22, 2006) (ruling that "[c]lassifications that are made for tax purposes need only have a rational basis" unless made upon the basis of suspect categories). Disparate treatment meets rational basis review if the distinction made between classes is reasonably related to "a legitimate state interest." See Crocker and Crocker, 157 Or App 651, 662,971 P2d 469 (1998). A rational basis will also be found if there exists "any conceivable state of facts which would support [the distinctions]."Huckaba v. Johnson, 281 Or 23, 26, 573 P2d 305 (1978); see generallyGall I, 19 OTR at 194-95 (noting that taxation of taxpayer's manufactured home, a tax not imposed on recreational vehicles, did not violate Article I, section 20, of the Oregon Constitution because a conceivable state of facts existed to support the classification). However, it "is not sufficient to merely point out differences between the groups of taxpayers for divergent treatment. The differences justifying the attempted classification must bear a reasonable relationship to the legislative purpose." Huckaba, 281 Or at 26.
In Crocker, the court held that a statute which permitted the court to order divorced or separated parents to support children between ages 18 and 21 attending college, but imposed no similar obligation on married parents, did not violate Article I, section 20, because the statute was "rationally related to a legitimate state interest" of ensuring that parents support children attending school. The legitimate state interest in Crocker was "a well-educated populace," even though children in that age group (ages 18 to 21) have no legal right to parental support while attending school, because "the state [nonetheless] has an interest in having parents support their *Page 11 
children in that endeavor." Crocker, 157 Or App at 660. The court concluded that the legislative scheme was rational because "legislators could rationally believe that, because of the nature of divorce and separation, there will be instances in which children will not receive support from their parents to attend school precisely because the parents are divorced or separated, despite the fact that the parents have the resources to provide the support * * *." Id. at 661. In looking for a conceivable set of facts that would support the distinction between married and divorced (or separated) parents, the court offered a variety of reasons that legislators could rationally believe would prevent divorced and separated parents from supporting their child while the child attends school. Id. at 661. The court summarized its analysis by stating that "but for the fact that a child's parents are divorced or separated, the parents would support the child while the child attends school * * * [and] the parents' marital status operates to thwart the state's interest." Id. (emphasis in original). At the same time, the court found it was rational for the legislature to not give courts the authority to require parents from intact families (i.e., married couples) to provide the same support because "[l]egislators could rationally assume that, in most instances, parents in intact families will be able to make reasonable decisions about whether to support their children attending school." Id.
What is the legitimate state interest behind the administrative rule here in dispute? One possibility is marriage. The Oregon Supreme Court has previously ruled that marriage is a legitimate state interest.Li v. State of Oregon, 338 Or 376, 391, 110 P3d 91 (2005) (stating that the state has an "interest in marriage contracts and [is] entitled to exercise legislative control over them."). *Page 12 
Assuming the interest here being protected is marriage, the next question is whether the rule's distinction between same-sex and opposite-sex domestic partners is rationally related to the state's interest in marriage. There was clearly a rational relationship before the rule was promulgated, because under federal law, Internal Revenue Code (IRC) section 106 and IRC Reg. 1-106-1 (to which Oregon is statutorily tied under ORS 317.007), the income exclusion was originally available only to married couples (employees and their spouses), and it was rational for the legislature to assume that the financial benefit inuring from the exemption provided an incentive for people to marry. The department's rule, however, extends the exemption to same-sex domestic partners who are not married. The court concludes that the distinction in the rule retains the rational relationship to the state's interest in marriage because the exemption via federal law is available to married couples (who under Oregon law must be of opposite sex) and the rule extends the benefit to people of the same sex provided they "[d]esire a relationship of marriage under Oregon law and would enter into marriage with the other person, and only the other person, if Oregon law permitted it." OAR 150-316.007-(B). At the same time,"[c]ouples who choose to live together without marriage also choose not to avail themselves of [those] benefits * * *." Shuraleff v.Donnelly, 108 Or App 707, 715, 817 P2d 764 (1991).
Noting that it was legally impossible for same-sex couples to enter civil marriage, the Tanner court pointed out that because of their legal status, "the benefits [of marriage] are not made available on equal terms [to such couples]." Tanner, 157 Or App at 525. Opposite-sex couples like Plaintiff and her domestic partner, on the other hand, are free to enter into marriage and avail themselves of those benefits via IRC section 106. Because the state has a legitimate interest in marriage, limiting the state income tax exemption for the imputed value of employer provided health benefits to married couples and same-sex domestic partners who desire to be *Page 13 
married has a rational basis. Additionally, Oregon does not recognize common law marriage and can make classifications to maintain its status as a civil marriage state.[7]
 III. CONCLUSION
For the reasons set forth above, the court concludes that the basis for the classification allowing an exemption for the imputed value of health insurance benefits provided by an employer to an employee's same-sex domestic partner, but not for the imputed value of such benefits provided by an employer to an employee's opposite-sex domestic partner, is rational, and the disparate treatment of opposite-sex, unmarried domestic partners does not violate Article I, section 20, of the Oregon Constitution. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.
Dated this ____ day of September 2008.
[1] All references to the Oregon Administrative Rules (OAR) are to 2005.
[2] The rule is effective for "[t]ax years beginning on or after January 1, 2000," plus earlier years "for which an overpayment of tax may be refunded or a notice of deficiency may be issued under any law of this state applicable to personal income taxation." OAR 150-316.007-(B)(4). The year at issue herein is 2006, and is clearly covered by the disputed rule.
[3] All references to the Oregon Revised Statutes (ORS) are to 2005.
ORS 305.100 provides, in part: "The Department of Revenue shall: (1) Make such rules and regulations it deems proper to regulate its own procedure and to effectually carry out the purposes for which it is constituted."
[4] Article I, section 20, of the Oregon Constitution provides: "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."
[5] It should be noted that the Tanner court, while adhering to this distinction, also cautioned that the "case law on that point is not entirely consistent." Tanner, 157 Or App at 523.
[6] Social prejudice against opposite-sex, unmarried domestic partners has historically taken the form of housing or employment discrimination.See Chen v. County of Orange, 96 Cal App 4th 926, 940,116 Cal Rptr 2d 786 (2002) (citing examples of discrimination, such as a devout Presbyterian landlord refusing to rent to unmarried couples due to her belief that it would be a sin to rent to people who will engage in nonmarital sex).
[7] Oregon does not recognize common law marriage and courts are cognizant that they "must not convert Oregon `to a common law marriage state by the back door.'" Shuraleff, 108 Or App at 715. *Page 1